# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs May 6, 2014

## STATE OF TENNESSEE v. CALVIN JONES

**Appeal from the Criminal Court for Shelby County**
**No. 11-06965, 12-01373      Carolyn W. Blackett, Judge**

---

**No. W2013-00881-CCA-R3-CD - Filed July 31, 2014**

---

The Defendant, Calvin Jones, was convicted by a Shelby County jury of aggravated child abuse and first degree felony murder, for which he received concurrent sentences of 20 years and life imprisonment. In this appeal, the Defendant argues that the evidence is insufficient to sustain his convictions. Additionally, he argues that the trial court erred in permitting Dr. Karen Lakin to testify as an expert witness and erred in admitting autopsy photographs of the victim. Upon our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and ALAN E. GLENN, J., joined.

Marvin Ballin and Richard S. Townley, Memphis, Tennessee, for the Defendant-Appellant, Calvin Jones.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Carrie Shelton, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

This appeal stems from the death of two-year old Saniiyah Kuykendall ("the victim") on May 15, 2010. The Defendant and his girlfriend, Anisha Alford, were subsequently indicted on charges related to the victim's death. At trial, Ms. Alford testified on behalf of the State; however, the record is silent as to the disposition of her case.

**State's Proof.** Lynette Richardson and Charlene Angelina Logan testified that in the spring of 2010 the victim and her brothers regularly attended their home daycare center,

Hosanna's Little Angels. On Friday, May 14, 2010, the day before the victim's death, the victim and her brothers were dropped off at daycare by their mother at 8:50 a.m. and picked up by the Defendant at 5:45 p.m. Ms. Logan testified that the victim had not been sick that day or the week leading up to her death. She recalled that the victim acted "normal" at daycare and played with the other children as she usually did. She did not complain of any illnesses or pain. Ms. Logan testified that when a child was sick at daycare, her policy was to immediately contact the parents.

Ms. Richardson testified that the victim was not "fully potty trained," which was not uncommon for a child around the victim's age. The victim had "an accident" around 2:00 p.m. that day when she soiled her pants. Ms. Logan cleaned up the victim and put a diaper on her because her parents had failed to provide a change of clothes for her. Ms. Logan reported the accident to the Defendant that afternoon when he picked up the victim and her brothers. Ms. Logan did not observe any of the other children strike the victim while at daycare, and by law, she did not have permission to spank or physically discipline the children. She testified that when the victim left the daycare center, she did not have anything wrong with her arm and was not bleeding or clutching her stomach. Ms. Richardson testified that when the victim left the daycare center, the victim did not have any bruises on her head, buttocks, or chest; she was not having any noticeable breathing problems; and she was not cold to the touch. Ms. Richardson also testified that the victim had not vomited or had diarrhea and had not spit up any blood while at daycare. Both Ms. Richardson and Ms. Logan gave statements to the police following the victim's death.

Barneka Lewis, Anisha Alford's cousin, testified that on May 14, 2010, she and Ms. Alford dropped off her son and Ms. Alford's three children at daycare. She recalled that the victim acted "normal" that morning before daycare and was "playful" and "cheerful like the rest of the kids." The Defendant and Ms. Alford agreed to watch Ms. Lewis's son after daycare while she was still at work, so she dropped off her son at their apartment around 5:00 p.m. She returned around 11:00 p.m. to pick up her son. When she arrived at their apartment, Ms. Alford met her at the door holding the victim in her arms. Ms. Alford was crying and told her that something was wrong with the victim. Ms. Lewis testified that the victim was cold to the touch, had a "knot" on her back, and had a bruise on her face. She also recalled that the victim had difficulty breathing and vomited a clear liquid. She did not observe anything wrong with the victim's arm, but she recalled that Ms. Alford had previously told her that the victim had broken her arm and that it was not healing properly.

Ms. Lewis offered to watch the other children so that Ms. Alford and the Defendant could take the victim to the hospital. She testified that Ms. Alford initially accepted her offer but changed her mind after talking with the Defendant. She offered to watch the other children a second time in front of the Defendant, but he told her that the victim was "just

tired" and needed to "lay down and get her rest." Ms. Lewis testified that she deferred to the Defendant's and Ms. Alford's decision because "they knew [the victim] better than [she] did." The following day, the Defendant called Ms. Lewis to tell her that the victim had died. She recalled that the Defendant said that he wished it had been him instead of the victim.

Anisha Alford, the victim's mother, testified that in May 2010, she lived with the Defendant and her three children. She testified that the victim was not the Defendant's biological child. She denied that she had entered an agreement with the State for her testimony in the Defendant's trial.

Ms. Alford testified that the victim was two years old at the time of her death. She described the victim as "a typical two year old" who could walk, run, jump, and talk. Ms. Alford testified that on the morning of May 14, 2010, the victim "was being herself," talking and playing. She was not sick, and Ms. Alford did not observe any bruises on the victim before she dropped her off at daycare. Ms. Alford testified that the daycare center typically called her if any of her children became ill; she did not receive a call from the daycare center that day. She spoke to the Defendant after he picked up the children from daycare, and he informed her that the victim had soiled herself and had been acting up at daycare so he had "popped her on her butt."

Ms. Alford testified that she did not drive and had to rely on others to get to and from work. On the evening of May 14, 2010, the Defendant picked her up from Wal-Mart after her shift around 8:00 p.m. He was late in picking her up and explained to Ms. Alford that the victim had soiled herself again and he had to "clean that sh-t up." Ms. Alford testified that the victim was "sort of potty[-]trained" and would have "accidents every now and then," which angered the Defendant. When Ms. Alford got into the car, she noticed that the victim was "kind of slump[ed] down in the backseat" and spit up on herself as they were driving. She asked the Defendant if they should take her to the hospital, and he told her that the victim was not acting like that before Ms. Alford got into the car and was "just acting" for attention. She testified that it was not normal for the victim to be slumped over but because the Defendant was not concerned with her condition, Ms. Alford did not insist that they take her to the hospital.

When they arrived at their apartment, Ms. Alford noticed that the victim was walking very slowly and was not talking, which was unusual. Once inside, the victim did not play with the other children as she normally would and instead sat down beside Ms. Alford on the couch. Because the victim was not feeling well, Ms. Alford told the victim that she could go lie down. A short time later, Ms. Alford checked on the victim and observed that the victim was "breathing funny" and was cool to the touch. The Defendant told Ms. Alford that the victim was probably dehydrated and told her to give her some juice. Ms. Alford also

recalled that the victim vomited a yellow and red substance. When she asked the Defendant about it, he responded that he had fed the victim a yellow popsicle and that she had bitten her tongue and swallowed blood. When Ms. Lewis arrived to pick up her son, Ms. Alford told her that the victim was sick but that they were not going to take her to see a doctor until the next morning because she did not think it was a "rush situation." She showed Ms. Lewis the bruise on a victim's forehead and a "bump" on her back. Ms. Lewis offered to watch the other children while Ms. Alford and the Defendant took the victim to the hospital, but the Defendant said there was "no need." Ms. Lewis left around midnight.

After Ms. Lewis left, Ms. Alford made a pallet for the victim in the master bedroom where she and the Defendant slept so that she could "keep an eye on [the victim]." At one point, the victim moved towards the head of the bed and the Defendant "grabbed her up and made her get back down" towards the foot of the bed. Ms. Alford told the Defendant not to "be pulling on [the victim] like that," and the two got into an argument. Soon afterwards, everyone went to sleep. At around 3:00 a.m., the victim got into bed next to Ms. Alford. The two lied there for a while, and then Ms. Alford told the victim to get back on her pallet and go to sleep.

The next morning, Ms. Alford awoke at 6:57 a.m. and noticed that the victim was not on her pallet. Ms. Alford found the victim lying on the floor in her sons' bedroom and picked her up because she thought the victim must be cold. At that point, she realized the victim was dead and started screaming. The Defendant ran into the bedroom to see what was wrong and took the victim from Ms. Alford while she called 911. Ms. Alford ran outside screaming that something was wrong with her baby. A neighbor told her that she was a nurse and attempted to perform CPR on the victim. The police and paramedics arrived soon after and declared the victim dead at the scene.

Ms. Alford gave a statement to police on May 15, 2010, regarding the victim's death. At that time, she told police that the Defendant had told her that the victim had "been acting up all day at daycare . . . messing with the other children." He also told her that the victim had soiled her pants and that he "whoop[ed] her." Ms. Alford further testified that the Defendant routinely disciplined the victim by hitting her in the chest with a belt or a shoe. She acknowledged that she physically disciplined the victim and her other children by spanking them on the buttocks with a belt, a comb, or her hand when they "d[id] something serious" like hit the other children. She also acknowledged that she pinched the victim on May 14, 2010, when she thought the victim rolled her eyes at her, but she denied hitting or spanking the victim that day. She insisted that if the Defendant had told her he had punched or kicked the victim, she would have taken her to the hospital.

-4-

Shannon Blake Thompson, a paramedic with the Memphis Fire Department, responded to a call at the Defendant's apartment. Mr. Thompson arrived on the scene to find a female neighbor attempting to perform CPR on the victim. He testified that "it was pretty obvious right away that [the victim] had been dead for some time." The victim was unresponsive and appeared to be stiff. Mr. Thompson's initial finding was confirmed when he put a monitor on the victim to obtain her vital signs. He attempted to check her vital signs several times, but she "flat-lined" every time. At that point, he pronounced the victim dead at the scene and turned the matter over to the police.

The victim's older brother, J.A.[1], was seven years old at the time of trial and testified about his last day with the victim. He recalled that they went to daycare that day and that neither Ms. Logan nor Ms. Richardson hurt the victim. He also recalled that the victim got into trouble with the Defendant for soiling her pants and that the Defendant "whooped [the victim]." J.A. did not see the Defendant "whoop" the victim but knew that he had because the victim was crying. In the car ride to pick up his mother, J.A. recalled that the victim was lying on his leg because she was tired. He saw her vomit and saw blood on her lip. J.A. testified that the Defendant was mad at the victim that night but did not know why. He denied that he or his mother hurt the victim that night.

Dr. James Caruso, a forensic pathologist, was tendered as an expert in forensic pathology without objection. Dr. Caruso performed the victim's autopsy on May 15, 2010. He observed a "fair number of contusions and abrasions" on the victim, including a contusion on her forehead, several contusions and abrasions on her face and neck, and a contusion on her lower lip that was "certainly caused by blunt force."[2] Additionally, he found evidence of brain injury, which he explained was "really not life threatening" but "show[s] that a significant force had been applied to the head area shortly before [the victim's] death." He compared the victim's head injury to "what [one] would expect if somebody suffers a severe concussion of head trauma performed during a sporting event or motor vehicle crash." Dr. Caruso also described a fracture to the victim's left forearm, which resulted in a noticeable disfigurement to her arm. He had difficulty dating the fracture and opined that it was possible the injury occurred after the victim's death. The victim also had a number of contusions and abrasions on her chest, evidencing blunt force injury. Dr. Caruso stated that it would be "extremely unlikely" that these injuries were caused by someone

---

[1] It is the policy of this court to refer to juveniles by their initials so as to protect their anonymity.

[2] Dr. Caruso explained to the jury that a contusion is commonly referred to as a bruise and an abrasion is commonly referred to as a scrape or cut [263]. For consistency and clarity, we will utilize the terms contusion and abrasion as used by Dr. Caruso.

performing CPR on the victim because CPR is unlikely to cause abrasions even if performed improperly and cannot cause contusions without circulating blood.

Dr. Caruso testified that the victim had several rib fractures that "were definitely old and healed" and others that were fairly new and had not yet healed. Additionally, she had several areas "where there was just hemorrhaging around the ribs" but no fracture. A photograph of the victim's ribs on the right side of her body near her spine was shown to the jury, which Dr. Caruso described as evidence of injury or stress to that area. Another photograph of the left side of the victim's body taken farther away from the backbone was shown to the jury, which Dr. Caruso described as healed fractures and areas of hemorrhaging from recent injury.

Dr. Caruso testified that the victim also had a laceration, or break in the tissue, of her liver caused by a blunt force injury. A photograph of the back side of the liver was shown to the jury. He noted that the location of the laceration was near but not adjacent to the rib fractures and explained that force applied to one area can be transmitted to other areas. He opined that the laceration likely occurred as a result of the compressive force applied to the ribs. Dr. Caruso also found a contusion on the victim's bowel and opined that the bowel had a "small perforation" as well, based upon the fact that the victim was suffering from peritonitis. Dr. Caruso explained that peritonitis is an infection or inflamation of the body cavity that holds the intestine. It is usually caused by bacteria in the bowel leaking into the area surrounding the bowel, which led Dr. Caruso to conclude that the victim had a bowel laceration. Dr. Caruso testified that the victim was alive when the peritonitis infection developed because her body had a "vital reaction" to it as evidenced by inflammatory cells surrounding the outside of the bowel.

Dr. Caruso also observed discoloration on the victim's buttocks and examined the soft tissue under the skin to determine the cause. He found hemorrhage or blood in the fat tissue under the skin covering the buttocks, which confirmed that the victim had deep contusions on the buttocks that were sustained "relatively recent[ly]." He explained that the hemorrhage "would not be there if there weren't any injury" and concluded "that a blunt force had been applied to her buttocks area[.]" A photograph of the deep, soft tissue underneath the victim's buttocks was shown to the jury.

Dr. Caruso testified that peritonitis is a life-threatening medical condition that requires immediate medical attention. He stated that peritonitis "will typically make someone fairly ill" and opined that someone with peritonitis would have a "toxic appearance" and act "lethargic." When asked whether the victim's injuries would have caused a significant amount of pain, Dr. Caruso responded, "Everybody's pain threshold is a little different . . .

. [so] I can't gauge how much pain the individual would have felt, but again I would expect this to be an uncomfortable toxic appearing child."

As part of the autopsy, Dr. Caruso conducted additional tests to check for disease and other bacterial infections. He noted that at the time of her death, the victim was two years old, weighed 29 pounds, and was 37 inches long. While the victim was poorly nourished, Dr. Caruso found no evidence of significant natural disease. He concluded that the victim's cause of death was multiple blunt force injuries and manner of death was homicide. He explained that the victim's injuries were caused by multiple episodes of compressive force and were not the result of a single blow. He further explained that the victim's injuries suggest that "the force was applied at a time when [the victim] could not move freely in reaction to that force" and agreed that it could have resulted from multiple hits or kicks delivered while the victim was lying on the floor.

Sergeant Connie Justice of the Memphis Police Department, the case investigator for the death of the victim, explained that the victim's death was not considered a homicide until after she received the results of the autopsy. Sergeant Justice informed Ms. Alford that the victim would be transferred to the forensic unit and that an autopsy would be performed on the body to determine the cause of death. Prior to receiving the results of the autopsy, Sergeant Justice received information from the medical examiner that there was evidence of possible abuse on the victim. As a result, Sergeant Justice shifted her investigation from a death investigation to a homicide investigation. After receiving the results from the autopsy, Sergeant Justice asked Ms. Alford and the Defendant to come to the police station to discuss the victim's death. They arrived at the police station at approximately 3:30 p.m. on May 15, 2010.

Sergeant Justice spoke to Ms. Alford first. She advised Ms. Alford of her rights and talked to her for over an hour about the events leading up to the victim's death. Sergeant Justice then spoke to the Defendant. She advised him of his rights and confirmed that he read from and signed an advice of rights form. The form, which was admitted into evidence, stated that the Defendant understood his rights and wanted to talk about the victim's death. The Defendant signed the form at 5:31 p.m. on May 15, 2010.

Sergeant Justice testified that the Defendant told her that he had picked up the children from daycare at 5:45 p.m. and was informed by the daycare staff that the victim had soiled her pants. He also said that the daycare staff told him that the victim had been sick at daycare, vomiting and having diarrhea. Because she did not have a change of clothes, the victim was wearing a diaper and the clothes she wore to the daycare center. The Defendant told Sergeant Justice that the victim was fine when they first arrived home and that she played with the other children "in a dog pile on the floor." He fed the children hotdogs at

7:00 p.m., and afterwards the victim threw up a few times. The Defendant told the victim to stand over the toilet in case she threw up again, and while doing so, the victim "acted" as if she were weak, fell and hit her head on the commode. She vomited two more times in the commode. The Defendant told the victim to change out of the diaper she had been wearing and to go lie down in the kids' room while he cleaned the bathroom. The victim then soiled her clothes again and the Defendant changed her clothes and cleaned up the area where she had the accident.

The Defendant told Sergeant Justice that the victim vomited again by the front door as he gathered the children together to go pick up Ms. Alford. The Defendant cleaned up the vomit and changed the victim's clothes, which made them late to pick up Ms. Alford. The Defendant noticed that the victim was "lying over her brother" in the car on the way to pick up Ms. Alford, and the victim vomited again after they picked up Ms. Alford. The Defendant told Sergeant Justice that when they arrived home, the victim walked "real, real slow[ly]" back to the apartment and fell about three times. The Defendant stated however, that the victim was only "acting" to get attention from her mother. Once inside, the victim lied down on the couch while the other children played. The Defendant told Sergeant Justice that he and Ms. Alford discussed taking the victim to the hospital but ultimately decided against it because the Defendant believed that she just had a twenty-four hour virus. The Defendant estimated that the victim vomited six or seven times and had diarrhea three to four times that day.

The Defendant told Sergeant Justice that Ms. Lewis came to the apartment later that evening after the other children had gone to bed. Ms. Lewis offered to stay with the other children while the Defendant and Ms. Alford took the victim to the hospital, but the Defendant believed there was "not a need." After Ms. Lewis left, the victim would not go to sleep so the Defendant "kind of bribed her" by telling her that he would take her to Chuck E. Cheese's. He told Sergeant Justice that the victim lied down on her pallet around 2:00 a.m. and then woke up at 3:00 a.m. and told Ms. Alford that she was cold. Soon afterwards, they all went to sleep again. The Defendant told Sergeant Justice that he woke around 7:00 a.m. the next morning, and he and Ms. Alford found the victim deceased in another room.

The Defendant told Sergeant Justice that he physically disciplined the victim by spanking her with a brush or his hand or "pop[ping]" her with a shoe on her leg or chest. He stated that occasionally he accidently hit the victim in the stomach because she was "flailing around" trying to avoid his hits. She also ran into furniture like the coffee table while trying to avoid his hits. He insisted that he did not physically discipline her at all on May 14, 2010. When asked about the "bump" on the victim's forearm and upper back, the Defendant explained that she got those injuries from falling. He also explained that she had gotten a bruise on her forehead when she fell and hit her head on the commode. The Defendant told

Sergeant Justice the victim was clumsy and fell down and hurt herself often. She also "fakes all the time" to get attention from her mother. Additionally, the Defendant told Sergeant Justice that the victim bruised easily because she was anemic.

On cross-examination, Sergeant Justice explained that the Defendant was charged based on the information he provided to police about disciplining the victim. At that time, he was handcuffed, and his leg was shackled to the bench in the interview room. Sergeant Justice then reduced the Defendant's oral statement to writing, but the Defendant did not sign that statement. Sergeant Justice confirmed that she left the interview room at 6:20 p.m. and that two other officers completed the interview with the Defendant.

Sergeant Kevin Lundy of the Memphis Police Department interviewed the Defendant on May 15, 2010. The Defendant had already been advised of his rights and had given an initial statement to Sergeant Justice when Sergeant Lundy interviewed him. The Defendant was handcuffed to a bench during the interview. The Defendant gave several explanations to Sergeant Lundy for the victim's injuries, including that the victim was clumsy and that the injuries occurred while she was at daycare. Sergeant Lundy believed the explanations given by the defendant "were not consistent" with the victim's injuries, so he "confront[ed]" the Defendant with the "inconsistencies." At that point, the Defendant "hesitated" and then told Sergeant Lundy that he spanked the victim because she had defecated on the bathroom floor. He told Sergeant Lundy that he held the victim down on the ground and hit her repeatedly with an open hand, a fist, and a tennis shoe. The victim tried to flee when the Defendant began hitting her but was unable to do so. The Defendant demonstrated for Sergeant Lundy how he hit the victim and stated that he hit her approximately thirteen or fourteen times. The Defendant told Sergeant Lundy that he informed Ms. Alford that he spanked the victim, after which the victim began acting unresponsive and disoriented.

Sergeant Lundy told the Defendant he was going to reduce his statement into a formal, written one for the Defendant to review and sign. The Defendant initially agreed but then changed his mind and refused to give a formal statement. Sergeant Lundy testified that he took notes during his interrogation of the Defendant and that he reduced those notes into a supplement.

Dr. Karen Lakin, a general pediatrician and the medical director for the LeBonheur Child Assessment Program, was certified as an expert in the field of child abuse pediatrics over objection by the Defendant. She testified that she was board-certified in general pediatrics and child abuse pediatrics. As an expert in child abuse pediatrics, she rendered opinions about whether a child's injuries were accidental or non-accidental based on the pathology and physiology of the injuries. Additionally, she served on the Shelby County

Fatality Review Team, which reviewed all child deaths in Shelby County. She had observed a number of autopsies but had never conducted an autopsy.

Dr. Lakin testified that she reviewed the victim's autopsy report and photographs; Ms. Alford's and Ms. Lewis's statements; the pre-hospital report by the paramedics; and the supplemental reports of the two investigating officers, which included the initial statement given by the Defendant. She testified that peritonitis is a life-threatening condition, requiring medical treatment. Noticeable symptoms include fever, chills, lethargy, severe abdominal pain, lack of appetite, and diarrhea. She opined that all of the victim's injuries, which included hemorrhages in the head; rib fractures; and a perforated liver and bowel, were "very traumatic" and "severe injuries." She further opined that the victim's peritonitis and other internal injuries were "very painful."

Dr. Lakin discounted other causes for the victim's injuries such as spanking, playing with other children, bumping into furniture, and being anemic. She testified that as a clinician, she often heard similar excuses and explanations in suspected non-accidental injury cases. Dr. Lakin also noted that the "toddler age group," especially while potty training, is at a very high risk for abuse. She agreed that the victim's injuries were consistent with the Defendant's statement to Sergeant Lundy that he repeatedly struck the victim with his fist and a shoe. With respect to the victim's broken arm, Dr. Lakin testified that her arm would have needed to be splinted in order to heal properly and that the deformity would have been "very painful." Dr. Lakin opined that the victim was in "extreme pain prior to her death."

**Defense Proof.** Patricia Perkins testified that she had known the Defendant since 2002 as a member of her church. She testified that the Defendant's reputation in the community was as a peaceful, quiet, and truthful person. On cross-examination, she agreed that she did not live in Shelby County and was not present when the victim died.

Reverend Kennan Seay, the Defendant's cousin, testified that the Defendant had a reputation in the community for being peaceful, quiet, and truthful. He also testified that the Defendant attended church regularly. On cross-examination, Reverend Seay agreed that he was not present when the victim died.

The Defendant testified that he and Ms. Alford began dating in January 2008 and had one child together. Ms. Alford's other two children were from a previous relationship. The Defendant and Ms. Alford moved in together in March 2010 at Autumn Ridge Apartments. At the time, the Defendant worked at Pizza Hut and Lowe's.

The Defendant's testimony about the events leading up to the victim's death was largely consistent with the investigating officers' testimony. The Defendant confirmed that

he picked up the three children from daycare on May 14, 2010 at 5:45 p.m. and was their sole caretaker until he picked up Ms. Alford from work at approximately 8 p.m. He reiterated that the victim was sick when he picked her up from daycare and continued "getting worse through the night." However, in contrast to Sergeant Justice's and Sergeant Lundy's testimony, the Defendant maintained that he "pleaded" with Ms. Alford to take the victim to the hospital due to her worsening condition. He claimed that Ms. Alford believed the victim was only suffering from a twenty-four hour virus and feared that she might lose her job if she requested additional time off in order to take the victim to the hospital. The Defendant also claimed that he observed Ms. Alford pinch the victim when she rolled her eyes at Ms. Alford and "whip" the victim with a shoe when she "swung" at Ms. Alford's face.

The Defendant adamantly denied that he hit or slapped the victim and denied that he told the interviewing officers that he did. He testified that he went to the police station on the day of the victim's death to discuss the victim's autopsy report and was never informed that he was going to be charged with the victim's death. He acknowledged that he read and signed an "Advice of Rights" form but claimed that he was told that he had to sign the form in order to hear the results of the victim's autopsy report. He stated that Sergeant Justice initially questioned him about the victim's death and that he told her that the victim had been sick that day. After Sergeant Justice left, two other officers came in and "started hollering at [him] and hitting the table" and then shackled the Defendant to the bench. He claimed that the officers came up with different scenarios about his beating the victim and told him if would "just lie" and admit to it he would only be charged with manslaughter. He said that he initially agreed to "lie" and say he hit the victim repeatedly with a shoe but then told the officers he would not admit to hitting the victim and would not sign a document to that effect. He agreed that the victim suffered a "brutal beating" on the night of her death based on the injuries she sustained but maintained that it must have occurred while he was asleep. He suggested that Ms. Alford took the victim outside during the night and beat her while he was asleep.

Following deliberations, the jury convicted the Defendant as charged in the indictment of one count of aggravated child abuse and two counts of first degree felony murder. The trial court merged the two first degree felony murder convictions and sentenced the Defendant as a Range I, standard offender to concurrent sentences of 20 years at 100% for aggravated child abuse and life imprisonment for first degree felony murder. The Defendant filed a timely motion for new trial on January 10, 2013, which was denied by the trial court following a hearing in an order dated February 20, 2013. It is from this order that the Defendant now appeals.

**ANALYSIS**

On appeal, the Defendant argues that (1) the evidence is insufficient to sustain his convictions; (2) the trial court abused its discretion in permitting Dr. Lakin to testify as an expert; and (3) the trial court abused its discretion in admitting four autopsy photographs. The State responds that the evidence is sufficient to sustain the Defendant's convictions and that the trial court did not abuse its discretion in permitting Dr. Lakin to testify or in admitting four autopsy photographs. Upon our review, we agree with the State.

**I. Sufficiency of the Evidence.** The Defendant first contends that the evidence is insufficient to sustain his convictions. He argues that the evidence fails to establish the predicate felonies underlying his first degree felony murder convictions, namely aggravated child abuse and aggravated child neglect. The State responds that a reasonable juror could find beyond a reasonable doubt that the Defendant committed first degree murder in the perpetration of aggravated child abuse and aggravated child neglect.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are

questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. Id. This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

As relevant here, first degree felony murder is the "killing of another committed in the perpetration of . . . aggravated child abuse[] [or] aggravated child neglect[.]" T.C.A. § 39-13-202(a)(2) (2010). Aggravated child abuse is defined as "knowingly, other than by accidental means, treat[ing] a child under the age of eighteen (18) years of age in such a manner as to inflict injury" and the "act of abuse . . . results in serious bodily injury to the child[.]" Id. §§ 39-15-401(a) (2010); -402(a)(1) (2010). Aggravated child neglect is defined as "knowingly abus[ing] or neglect[ing] a child under eighteen (18) years of age, so as to adversely affect the child's health and welfare" and such act results in "serious bodily injury." Id. § 39-15-401(b); -402(a)(1). If the abused or neglected child is eight (8) years of age or less, the penalty is a Class A felony. Id. § 39-15-402(b).

"Serious bodily injury" is bodily injury that involves a substantial risk of death; protracted unconsciousness; extreme physical pain; protracted or obvious disfigurement; protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty; or a broken bone of a child who is eight (8) years of age or less. T.C.A. § 39-11-106(a)(34) (2010). "Serious bodily injury to the child" may also include "second- or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects." Id. § 39-15-402(d).

In the case sub judice, the Defendant first contends that the evidence is insufficient to support his conviction for first degree murder based on the predicate felony of aggravated child abuse because no witnesses personally observed him hit the victim and his statement to police regarding the victim's death was coerced.[3] In that regard, we note that "[i]n the absence of direct evidence, a criminal offense may be established exclusively by

_____

[3] Although the Defendant argued to the jury that his incriminating statements to police were coerced, he did not challenge their admissibility at trial. Likewise, he does not raise the admissibility of his statements as a separate issue for our review on appeal. Accordingly, we do not address this issue.

-13-

circumstantial evidence." Dorantes, 331 S.W.3d at 379 (citing Duchac v. State, 505 S.W.2d 237, 241 (Tenn. 1973); Marable v. State, 313 S.W.2d 451, 456-58 (Tenn. 1958)). As noted above, it is within the province of the jury to decide the weight given to circumstantial evidence and the inferences to be drawn from such evidence. Dorantes, 331 S.W.3d at 379 (citing Rice, 184 S.W.3d at 662). This court may not substitute its inferences for those drawn by the trier of fact in cases involving circumstantial evidence. State v. Sisk, 343 S.W.3d 60, 65 (Tenn. 2011) (citing State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010)).

Although no witness observed the Defendant hit the victim, there was ample circumstantial evidence from which the jury could infer his guilt. By his own admission, the Defendant was the only adult with the victim and her siblings from 5:45 p.m. when he picked them up from daycare until around 8:00 p.m. when he picked up Ms. Alford from work. Multiple witnesses testified that prior to that time, the victim was "normal" and "playful." More specifically, Ms. Alford and Ms. Lewis testified that they did not observe any bruises or other injuries on the victim before they dropped her off at daycare. Likewise, Ms. Logan and Ms. Richardson, the daycare workers, testified that victim played with the other children as she normally would and did not vomit or have diarrhea at daycare that day or in the week leading up to her death. They further testified that when the victim left their care with the Defendant that evening, she appeared healthy and did not have any noticeable injuries. After the Defendant picked up Ms. Alford from work around 8:00 p.m., the victim was lethargic, nauseous, and cold to the touch. Additionally, her breathing was labored and she had bruises on her face and a "bump" on her back.

The autopsy report further established that the victim had sustained a lacerated liver and bowel; a brain injury; several broken ribs; bruises to her head, face, neck, and buttocks; and abrasions to her chest. The victim was also suffering from peritonitis, a life-threatening condition requiring immediate medical attention, that was most likely caused by the laceration to the victim's bowel. Dr. Caruso opined that the victim's cause of death was multiple blunt force injuries caused by repeated episodes of compressive force. Further, he noted that the injuries suggested that the force was applied when the victim could not move freely in reaction to that force and agreed that the injuries were consistent with the Defendant's statement to police that he repeatedly hit the victim with his fist and a shoe while he held her on the ground.

Finally, even though the Defendant refused to sign a formal statement, the Defendant discussed the events leading up to the victim's death with investigators for over an hour. Although he initially denied that he physically disciplined the victim the night she died, he admitted that he would occasionally discipline the victim by spanking her with a brush or his hand or "pop[ping]" her with a shoe on her leg or chest. He also admitted that he had accidently hit the victim in the stomach because she was "flailing around" trying to avoid his

hits. He gave several explanations for the victim's injuries, including that the victim was clumsy and that the injuries occurred while she was at daycare. When confronted with various inconsistencies in his oral statement, the Defendant relented and admitted that he spanked the victim on the night of the offense because she had defecated on the bathroom floor. He explained that he held the victim down on the ground and hit her thirteen or fourteen times with an open hand, a fist, and a tennis shoe.

Although the Defendant adamantly asserted at trial that his statement to police was false and that he never hit the victim, the jury chose to reject the Defendant's version of events and resolved the conflicts in the evidence in favor of the prosecution's theory. On review, we will not reweigh the evidence or substitute our inferences for those drawn by the trier of fact. See Dorantes, 331 S.W.3d at 379 (citing Rice, 184 S.W.3d at 662). Based on the proof presented, a rationale juror could infer that the Defendant knowingly, other than by accidental means, treated the victim in such a manner as to inflict serious bodily injury, which ultimately resulted in her death. He is not entitled to relief.

The Defendant further argues that his conviction for first degree murder based on the predicate felony of aggravated child neglect is insufficient. As discussed above, the victim sustained serious bodily injury at the hands of the Defendant and exhibited obvious signs of injury and declining health as the night progressed. The Defendant and Ms. Alford both had knowledge and awareness of the victim's declining health, as evidenced by their testimony at trial and statements to police; however, they chose to forgo medical treatment for the victim, and her untreated injuries ultimately resulted in her death. This conduct constituted aggravated child neglect. See, e.g., State v. Adams, 24 S.W.3d 289 (Tenn. 2000) (parents' failure to seek medical help for child despite knowledge and awareness of his physical injuries constituted criminal child neglect).

Despite this evidence, the Defendant contends that Ms. Alford's own testimony established that she, rather than the Defendant, made the decision not to seek medical help, and therefore, his conviction on this count cannot be sustained. We disagree. First, although Ms. Alford agreed on cross-examination that she decided not to seek medical help for the victim that evening, she also testified that the Defendant repeatedly dismissed her concerns about the victim and discouraged her from seeking medical help. Ms. Lewis similarly testified that Ms. Alford considered seeking medical help for the victim until discussing it with the Defendant, who downplayed the seriousness of the victim's condition and declined Ms. Lewis's offer to watch the other children while he and Ms. Alford went to the hospital. The Defendant offered opposing testimony, asserting that he "pleaded" with Ms. Alford to take the victim to the hospital; however, the jury resolved this conflict in the evidence with their verdict, and we will not disturb their assessment on appeal. See Campbell, 245 S.W.3d at 335.

Further, in the instant case, the State also pursued the Defendant's guilt on the theory of criminal responsibility. Criminal responsibility is not a distinct crime but "a theory by which the state may prove the defendant's guilt based on another person's conduct." State v. Osborne, 251 S.W.3d 1, 16 (Tenn. Crim. App. 2007) (citing State v. Mickens, 123 S.W.3d 355, 389-90 (Tenn. Crim. App. 2003)). Thus, there is no requirement that the State "elect between prosecution as a principal actor and prosecution for criminal responsibility." State v. Hodges, 7 S.W.3d 609, 625 (Tenn. Crim. App. 1998) (citing State v. Williams, 920 S.W.2d 247, 257-58 (Tenn. Crim. App. 1995)). An individual is criminally responsible for the conduct of another person if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." T.C.A. § 39-11-402(2) (2010). Mere presence during the commission of a crime is insufficient to support a conviction; however, the defendant need not have taken physical part in the crime to be held criminally responsible. See State v. Sherman, 266 S.W.3d 395, 408 (Tenn. 2008) (citations omitted). "[E]ncouragement of the principal is sufficient." Id. Given the testimony of Ms. Alford and Ms. Lewis, which was accredited by the jury, a reasonable juror could find, at a minimum, that the Defendant directed, aided, or encouraged Ms. Alford to engage in conduct constituting aggravated child neglect. The Defendant is not entitled to relief.

**II. Expert Testimony.** The Defendant next contends the trial court abused its discretion in permitting Dr. Karen Lakin to testify as an expert in the field of child abuse pediatrics. He challenges the reliability of her testimony based on the novelty of the field of child abuse pediatrics and further maintains that there is too great an analytical gap between her opinions and the data relied upon. Additionally, he asserts that the trial court employed an incorrect legal standard in determining whether to admit her testimony. The State responds that the court properly permitted Dr. Lakin to testify and any error was harmless beyond a reasonable doubt.

"Questions regarding the qualifications, admissibility, relevancy, and competency of expert testimony are matters left within the broad discretion of the trial court." State v. Stevens, 78 S.W.3d 817, 832 (Tenn. 2002) (citing McDaniel v. CSX Transp., Inc., 955 S.W.2d 257, 263-64 (Tenn. 1997); State v. Ballard, 855 S.W.2d 557, 562 (Tenn. 1993)). Upon review, a trial court's ruling regarding expert testimony will not be overruled unless the trial court abused its discretion. Ballard, 855 S.W.2d at 562 (citing Baggett v. State, 421 S.W.2d 629, 632 (Tenn. 1967)). Under this standard, we will not reverse unless the "'court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999) (quoting State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997)).

-16-

"The admission of expert proof is governed by Tennessee Rules of Evidence 702 and 703." State v Copeland, 226 S.W.3d 287, 301 (Tenn. 2007) (citing Brown v. Crown Equip. Corp., 181 S.W.3d 268, 273 (Tenn. 2005)). Rule 702 provides: "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Rule 703 provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. . . . The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate a lack of trustworthiness.

The Tennessee Supreme Court has further defined the role of the trial court in assessing the reliability of expert testimony:

> Trial courts act as gatekeepers when it comes to the admissibility of expert testimony. Their role is to ensure that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice as an expert in the relevant field. A court must assure itself that the [expert's] opinions are based on relevant scientific methods, processes, and data, and not upon an expert's mere speculation. The court's reliability analysis has four general inter-related components: (1) qualifications assessment, (2) analytical cohesion, (3) methodological reliability, and (4) foundational reliability.

State v. Scott, 275 S.W.3d 395, 401-02 (Tenn. 2009) (internal citations and quotation marks omitted). "While a trial court's role as gatekeeper is critical, it is not unconstrained." Id. at 404. Where a proper foundation exists, the expert testimony "should be tested by the adversary process – competing expert testimony and active cross-examination – rather than excluded from jurors' scrutiny[.]" Id. (citation omitted).

In the present case, the Defendant does not challenge the qualifications of Dr. Lakin as an expert in the field of child abuse pediatrics. Indeed, her education and training in the field is extensive, as was established during her voir dire. She testified that she was a general pediatrician and the medical director for the LeBonheur Child Assessment Program; she had been board-certified in child abuse pediatrics, which required continuing education and

periodic testing through the American Academy of Pediatrics, since 2011; she was an assistant professor of pediatrics at the University of Tennessee and instructed other doctors in child abuse pediatrics; and she served on the Shelby County Child Fatality Review Team, which reviewed all child deaths in Shelby County. Dr. Lakin testified that she had been rendering opinions regarding accidental versus non-accidental trauma since 2000 and had testified in Tennessee as an expert in child abuse pediatrics. See State v. John Barlow, No. W2008-01128-CCA-R3-CD, 2010 WL 1687772 (Tenn. Crim. App. Apr. 26, 2010), perm. app. denied (Tenn. Sept. 24, 2010).

Notwithstanding her qualifications, the Defendant challenges the reliability of her testimony. First, he asserts that the field of child abuse pediatrics itself is unreliable because it is a "novel" field and has yet to be scrutinized by the appellate courts. We disagree. While formal certification in the field of child abuse pediatrics is fairly new, Tennessee courts have widely accepted expert testimony regarding child abuse and accidental versus non-accidental trauma. See, e.g., State v. Marie Delaluz Urbano-Uriostegui, No. M2012-00235-CCA-R3-CD, 2013 WL 1896931, at *6, *14-15. (Tenn. Crim. App. May 6, 2013), perm. app. denied (Tenn. Oct. 16, 2013) (testimony by expert in the fields of "pediatrics and child maltreatment" regarding the likely cause of the child victim's injuries); John Barlow, 2010 WL 1687772, at *3-5 (testimony by expert in fields of "pediatrics and child abuse within the area of pediatrics" that child victim suffered abusive trauma); State v. Russell Lee Maze, No. M2004-02091-CCA-R3-CD, 2006 WL 1132083, at *3-6 (Tenn. Crim. App. Apr. 28, 2006) (testimony by expert in the fields of "pediatric medicine and child abuse" that the child victim had suffered abusive and non-accidental trauma); State v. Andrew Neal Davis, No. M2002-02375-CCA-R3-CD, 2004 WL 1562544, at *6-7, *13-15 (Tenn. Crim. App. July 9, 2004), perm. app. denied (Tenn. Dec. 6, 2004) (testimony by expert in the fields of "pediatrics and child abuse" that child victim's injuries were not accidentally incurred). We see no reason to depart from this trend in the current case.

Additionally, we note that the Defendant's reliance on State v. Ballard, 855 S.W.2d 557, 562 (Tenn. 1993), is misplaced. In Ballard, the Tennessee Supreme Court held that testimony about the symptoms of post-traumatic stress syndrome exhibited by victims of sexually abused children was "not reliable enough to 'substantially assist' a jury in an inquiry of whether the crime of child sexual abuse has taken place." Id. at 562. Ballard is clearly distinguishable from the case before us. In contrast to the expert in Ballard, Dr. Lakin did not testify about the victim's behavior or common characteristics of abused children; rather, she testified about the specific physical injuries the victim sustained and opined about their cause. See State v. Lacy, 983 S.W.2d 686, 695 (Tenn. Crim. App. 1997) (distinguishing Ballard where expert testified about the victim's injuries that she observed rather than his behavior). We are unpersuaded that the field of child abuse pediatrics, which focuses on the physical injuries of the child victim and how they were caused, is not reliable enough to

"substantially assist" the jury in an inquiry of whether the crime of child abuse has taken place.

The Defendant next asserts that Dr. Lakin's testimony was unreliable because she conducted no "independent investigation" and merely reviewed the autopsy report and certain witness statements in forming her conclusions, creating an analytical gap between her opinions and data upon which she relied. In assessing the analytical cohesion of the expert's testimony, the trial court must "consider whether the 'basis for the witness's opinion, i.e., testing, research, studies, or experience-based observations, adequately supports that expert's conclusions." Scott, 275 S.W.3d at 402 (quoting Stevens, 78 S.W.3d at 834-35). The court should consider "how and why the expert was able to extrapolate from certain data to the conclusions that he or she has reached." Scott, 275 S.W.3d at 402 (citing Gen. Elec. Co. v. Joiner, 522 U.S. 136, 144-46 (1997)). Where there is "too great an analytical gap between the data and the opinion proffered," the expert testimony is properly excluded. Stevens, 78 S.W.3d at 834.

Here, Dr. Lakin testified that she was a general pediatrician and that she was board-certified in child abuse pediatrics. She explained that she was trained in pediatric pathology and the "mechanisms of injury" and "trauma." She rendered opinions based on the physical injuries of the victim, the victim's medical history, and information about how the injuries "present." She further testified that she evaluated a victim "just like we would do any child that's coming in" with a medical condition, considering both the physical injury or condition and the history of the illness. In reaching her conclusions in this case, she reviewed the victim's autopsy report and photographs, the pre-hospital report by the paramedics, witness statements, and the police reports. She directly applied her education and experience to the information gleaned from these sources to form her opinions. While she did not conduct an autopsy on the victim or personally interview any of the witnesses, "experts may base an opinion on the factual findings of others." Tenn. R. Evid. 602, Advisory Comm'n Cmts; see also Tenn. R. Evid. 703. In sum, we conclude that there was a "straightforward connection between [Dr. Lakin's] knowledge and the basis of the opinions such that no 'analytical gap' exist[ed] between the data and the opinion offered." See Stevens, 78 S.W.3d at 835.

Finally, the Defendant asserts that the trial court abused its discretion by employing an incorrect legal standard when admitting Dr. Lakin's testimony. As correctly noted by the Defendant, Rules 702 and 703 require trial courts to "determine whether the evidence will substantially assist the trier of fact to determine a fact in issue and whether the facts and data underlying the evidence indicate a lack of trustworthiness." McDaniel, 955 S.W.2d at 265 (emphasis added). This language varies slightly from the federal rules, which simply require that the evidence "assist the trier of fact," and has been interpreted by the Tennessee Supreme

Court to mean that the "probative force must be stronger before it is admitted in Tennessee." Id. at 264 (citation omitted).

In the present case, the trial court admitted the testimony of Dr. Lakin after a jury-out hearing and reasoned as follows:

> I think that a Court always has discretion as to whether something is a Jury question and the way it was expressed by [Defense] Counsel was that this would not assist the Jury. And I don't think any of us can say that with total one hundred percent confidence. If there's any scintilla of evidence or an opinion that may assist the Jury in making a decision, in this particular case, as the Jury instructions will specifically say that an expert is only a person who . . . has special knowledge of a certain area. But that person's credibility; that person's opinion; that person's conclusions are not better, no worse than any other witness that takes the stand under oath.
>
> . . . .
>
> I think that whatever Dr. Lakin can contribute to explaining what the infection was; what impact it had on the injuries that she had; the only thing it would do is to help the Jury to make a decision as to whether or not they have more credibility and more faith than what Dr. Caruso said versus her, and also being able to make an independent decision. Based upon all that, the Court's going to allow her to testify.

The Defendant highlights the trial court's use of the phrase "scintilla of evidence" in its ruling to support his contention that the trial court abused its discretion; however, taken in context and in light of the court's entire ruling, it is clear that the court properly considered the reliability of the testimony and its probative force. During a jury-out hearing, Dr. Lakin was questioned about her qualifications and experience in child abuse pediatrics and her expert opinions in this case. She was subjected to cross-examination by defense counsel, during which she was questioned extensively about her conclusions and the basis for those conclusions. In admitting the testimony, the trial court did not explicitly state that the testimony would substantially assist the jury; however, the court properly recognized that any expert testimony, even if minimal, should be admitted if it passes the rigors of Rule 702 and 703. See Scott, 275 S.W.3d at 404 ("[T]rial courts are not empowered to choose between legitimate competing expert theories by excluding the lesser of the two."). The trial court's ruling, taken in conjunction with the jury-out hearing, establishes that the court properly considered the substance of Dr. Lakin's testimony and concluded that it satisfied those requirements. We discern no abuse of discretion.

Further, even if the admission of Dr. Lakin's testimony was improper, such error was harmless. See Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."). Contrary to the Defendant's assertions, the record is replete with evidence establishing serious bodily injury aside from the testimony of Dr. Lakin. Dr. Caruso testified about the victim's numerous injuries, which included broken ribs, a brain contusion, and severe bruising on her buttocks. Additionally, she suffered a laceration of her liver and bowel, which resulted in peritonitis, a life threatening condition, that did in fact result in her death. See T.C.A. §§ 39-11-206(35), -15-402(d). In light of the ample evidence about the victim's extensive and serious injuries, it is unlikely that Dr. Lakin's testimony regarding the extreme pain the victim suffered more probably than not affected the judgments. The Defendant is not entitled to relief.

**III. Admission of Photographs.** The Defendant argues that the trial court abused its discretion by admitting four autopsy photographs because they were unfairly prejudicial. The State responds that the photographs were relevant to show that the victim suffered serious bodily injury and their probative value outweighed by the danger of unfair prejudice; therefore, the trial court did not abuse its discretion.

The trial court has discretion regarding the admissibility of photographs, and a ruling on this issue "will not be overturned on appeal except upon a clear showing of abuse of discretion." State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). First, a photograph must be "verified and authenticated by a witness with knowledge of the facts" before it can be admitted into evidence. Id. Second, a photograph must be relevant to an issue that the jury must determine before it may be admitted. State v. Vann, 976 S.W.2d 93, 102 (Tenn. 1998) (citing State v. Stephenson, 878 S.W.2d 530, 542 (Tenn. 1994); Banks, 564 S.W.2d at 951 (Tenn. 1978)). However, if the photograph's "prejudicial effect outweighs its probative value," it should not be admitted. See Tenn. R. Evid. 401 and 403; Banks, 564 S.W.2d at 951. A relevant photograph "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." See Banks, 564 S.W.2d at 951. Unfair prejudice has been defined by the Tennessee Supreme Court as "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily an emotional one." Id. Photographs must never be used "solely to inflame the jury and prejudice them against the defendant." Id.

Here, a total of eleven autopsy photographs were admitted into evidence and shown to the jury during the testimony of Dr. Caruso, the medical examiner who conducted the victim's autopsy. Of the eleven photographs, the Defendant objected to four photographs

-21-

that depicted the victim's internal injuries. The first photograph, Exhibit 23, is a view of the victim's spine that shows a hemorrhage along the spine. The second photograph, Exhibit 24, shows the victim's rib fractures. The third photograph, Exhibit 25, is a view of the laceration of the victim's liver. The fourth photograph, Exhibit 27, shows a deep contusion corresponding to the skin underneath the victim's buttocks. Prior to their admission, the second and fourth photograph were cropped so as to only show the specific injuries. In admitting the photographs, the trial court summarized its ruling as follows:

> There have been a number of conversations at the Bench during this recess relating to certain evidence, and for the record, the photographs that were shown to the Court of the injuries of the victim, there are a number of photographs; they were discussed; they've been agreed upon. The court's ruling that those photographs that have been agreed upon . . . reflect accurately the injuries that occurred to the victim; that the[ir] probative value is significantly and significantly does outweigh the prejudicial value of the photographs. I will note for the record that there were two photographs that we did think were highly prejudicial. Those have been adjusted by the State in terms of cropping them in such a way that I do think they are more probative at this time than they are prejudicial.

> I will note that the defense still objects to those photographs. I understand that, but I do feel that those photographs need to be disclosed to the Jury in order for the Jury to go forward with their process of deciding this case.

We recognize that "[a]s a general rule, where medical testimony adequately describes the degree or extent of an injury, gruesome and graphic photographs should not be admitted." State v. Collins, 986 S.W.2d 13, 21 (Tenn. Crim. App. 1998) (citing State v. Duncan, 698 S.W.2d 63, 69 (Tenn. 1985)). Further, "[p]hotographs made during or after an autopsy should be scrutinized and examined prior to being shown to the jury." Id. at 19 (citing State v. James Dubose, No. 01C019405-CC-00160, 1995 WL 504803, at *11 (Tenn. Crim. App. Aug. 25, 1995)). Here, however, the nature and extent of the victim's injuries were directly at issue. The Defendant offered varying explanations for the cause of the victim's injuries and suggested that these injuries were accidental in nature. The State's proof that the victim's injuries were inconsistent with accidental trauma or illness rested on the medical testimony of Dr. Caruso and Dr. Lakin. The autopsy photographs supplemented and corroborated this proof. Indeed, the photographs at issue were unpleasant; however, they were helpful in understanding the State's critical medical testimony. See Andrew Neal Davis, 2004 WL 1562544 (admitting autopsy photographs where the nature and extent of the victim's injuries were directly at issue); James Dubose, 1995 WL 504803 (admitting autopsy photographs of victim's internal organs to corroborate the testimony of the medical

examiner).  There is no indication that the "primary purpose" of the photographs was to "elicit emotions of 'bias, sympathy, hatred, contempt, retribution, or horror.'"  See Collins, 986 S.W.2d at 20 (citing M. Graham, Handbook of Federal Evidence 182-83 (2d ed. 1986)). Accordingly, the trial court did not abuse its discretion in admitting the photographs.  The Defendant is not entitled to relief.

## CONCLUSION

Based on the foregoing authorities and analysis, the judgments of the trial court are affirmed.


_____
CAMILLE R. McMULLEN, JUDGE